UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| SOUTHERN ENVIRONMENTAL LAW CENTER, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | 3:22-CV-00108-DCLC-DCP |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant, | ) ) ) | |
| EAST TENNESSEE NATURAL GAS, LLC, and TENNESSEE GAS PIPELINE COMPANY, L.L.C., | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

This case concerns whether, under the Freedom of Information Act, 5 U.S.C. § 552, Plaintiff, the Southern Environmental Law Center, may receive complete copies of two contracts that Defendant Tennessee Valley Authority signed with Intervenor-Defendants, Tennessee Gas Pipeline Company, L.L.C., and East Tennessee Natural Gas, L.L.C. Defendant and Intervenor-Defendants maintain that § 552(b)(4) exempts the disclosure of the redacted provisions of the contracts because they contain confidential commercial or financial information the release of which would cause Intervenor-Defendants foreseeable harm. Plaintiff, for its part, contends that the redacted provisions do not fall within that exemption and that disclosure would not cause Intervenor-Defendants harm.

The parties all move for summary judgment [Docs. 25, 43, 46, 52], and they have responded and replied to each motion [Docs. 44, 49, 50, 55, 58, 59, 60]. Accordingly, this matter is now ripe for resolution. Because the exemption in § 552(b)(4) applies to the withheld portions

of the contracts and the disclosure of those portions would cause foreseeable harm to Intervenor-Defendants, Defendant's and Intervenor-Defendants' Motions for Summary Judgment [Docs. 43, 46, 52] are **GRANTED,** and Plaintiff's Motion for Summary Judgment [Doc. 25] is **DENIED**.

## I.    BACKGROUND

In January 2020, Defendant Tennessee Valley Authority ("TVA"), a federal agency, began reviewing whether to retire a number of its coal-fired power plants in favor of alternative methods of energy production [Doc. 56, pgs. 5, ¶ 2; 11, ¶¶ 1-3]. To that end, TVA entered into "precedent agreements" with various natural gas pipeline companies. Precedent agreements "are the financial underpinning for a pipeline company's substantial capital investment . . . in expansions of its natural gas pipeline system." [Doc. 44-1, ¶ 4]. Precedent agreements include the terms and conditions for designing, permitting, and building a pipeline and all its attendant facilities [*Id.*]. Precedent agreements also detail the amount a customer owes for reservation and usage charges, which are based on fixed and variable costs for construction, operation, and maintenance of the pipeline and its facilities [*Id.*]. Ordinarily, precedent agreements set the terms under which a customer commits to enter into a natural gas shipping agreement "for a term of typically 15 or more years." [*Id.*].

TVA entered into a such an agreement ("Cumberland Agreement") with Intervenor-Defendant Tennessee Gas Pipeline Company, L.L.C., ("TGP") on August 11, 2021 [Doc. 56, pgs. 2, ¶ 1; 11, ¶ 1]. TGP is a natural gas pipeline company that transports natural gas to energy producers [Doc. 52-1, ¶ 3]. TGP's pipeline system extends from the Gulf of Mexico through Texas, Louisiana, Arkansas, Mississippi, Alabama, Tennessee, Kentucky, West Virginia, Ohio, Pennsylvania, New York, New Jersey, Massachusetts, New Hampshire, Rhode Island, and

Connecticut [*Id.*, ¶ 4]. The day after executing the Cumberland Agreement with TGP, TVA entered into another "precedent agreement" ("Ridgeline Agreement") with Intervenor-Defendant East Tennessee Natural Gas, LLC, ("ETNG") [Doc. 56, pgs. 2, ¶ 4; 5, ¶ 5]. ETNG owns, operates, and maintains a natural gas pipeline system that stretches through Tennessee, Virginia, North Carolina, and Georgia [Doc. 44-1, ¶ 2].

Plaintiff Southern Environmental Law Center ("SELC"), a nonprofit public interest organization focused on protecting the environment of the southeast, learned of TVA's review of its coal-fired plants and the Agreements TVA executed with TGP and ETNG [Docs. 1, ¶ 2; 45, ¶ 5; 48, ¶ 5; 51 ¶ 5]. On August 5, 2021, SELC submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to TVA for "[r]ecords of communications . . . with [TGP], Kinder Morgan, . . . [ETNG], or Enbridge regarding possible or planned gas infrastructure projects, including pipelines, compressor stations, and gas plants, to be constructed after January 2021." [Doc. 1-6, pg. 2]. In response, TVA produced redacted copies of the Cumberland and Ridgeline Agreements [Docs. 45, pg. 7, ¶¶ 6-7; 48, pg. 3, ¶¶ 6-7; 51, pgs. 2-3, ¶¶ 6-7]. TVA relied on 5 U.S.C. § 552(b)(4) ("Exemption 4"), which exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential," in making redactions to the Agreements [Docs. 45, pg. 8, ¶ 8; 48, pg. 3, ¶ 8; 51, pgs. 3, ¶ 8]. 5 U.S.C. § 552(b)(4).

On January 27, 2022, SELC notified TVA that it would withdraw the remainder of its FOIA request, so that TVA's production of the redacted copies of the Agreements could stand as TVA's final determination [Doc. 56, pg. 3, ¶ 7]. A few days later, SELC did just that and limited the scope of its FOIA request to the full, unredacted versions of the Agreements [*Id.*, pg. 3, ¶ 8]. TVA sent a final determination letter to SELC on February 4, 2022 [Doc. 1-10, pg. 2]. Three days

3

later, SELC administratively appealed TVA's decision to redact portions of the Agreement under Exemption 4 [*Id.*, pgs. 1-5].  On March 7, 2022, TVA's FOIA appeals officer affirmed TVA's decision to produce a redacted version of the Agreements [Doc. 1-11, pgs. 1-4].[1]

## A. The Cumberland Agreement and TGP's use of precedent agreements

The Cumberland Agreement between TVA and TGP detailed the construction and operation of a 32-mile long, 30-inch diameter pipeline that would supply natural gas to a proposed combustion turbine gas plant that TVA would operate instead of one of its coal-fired plants currently in operation [Doc. 56, pg. 11, ¶¶ 1-4].  H. Preston Troutman, Director of Business Development for Kinder Morgan, Inc., which is the corporate parent of TGP, explains that TGP uses precedent agreements to set out the terms and conditions of its business dealings with customers seeking natural gas transportation services [Doc. 52-1, ¶¶ 2, 7].  TGP's precedent agreements contain terms and conditions relating to geographical challenges, permitting requirements, costs of labor and materials, and other considerations [*Id.*, ¶ 10].

TGP keeps the information contained in precedent agreements confidential because of the competitive nature of the natural gas industry [*Id.*, ¶ 12].  Troutman states that TGP requires its customers to maintain the confidentiality of the information provided in its precedent agreements [*Id.*, ¶¶ 13-14].  During the negotiation of the Cumberland Agreement, TGP submitted confidential information to TVA [*Id.*, ¶ 15].  When SELC requested an unredacted version of the Cumberland Agreement, Troutman provided a response on behalf of TGP that stated the redacted information

---

[1]      In its appellate determination, TVA also relied on 5 U.S.C. § 552(b)(5) ("Exemption 5") as additional support for its redactions [Doc. 1-11, pgs. 1-4].  SELC initially challenged TVA's application of Exemption 5 in its motion for summary judgment [Doc. 26, pgs. 12-15].  But TVA, ETNG, and TGP declined to address the application of Exemption 5 in their cross-motions for summary judgment and responses [Docs. 44, 49, 54].  Accordingly, the Court considers Exemption 5 inapplicable and addresses the parties remaining arguments only.

4

was protected confidential commercial and financial information covered by Exemption 4 [*Id.*, ¶ 25]. Troutman contends that disclosure of the redacted provisions of the Cumberland Agreement would cause TGP substantial harm [*Id.*, ¶¶ 26-29].

Troutman details the redacted sections of the Cumberland Agreement. Section 1(B)(ii) of the Agreement sets out the rates and terms regarding TGP providing service to TVA's power plant [*Id.*, ¶ 31]. Section 2 discusses the "terms, procedures, and mechanisms for [TGP] conducting an open season to provide a portion of the [] capacity for [TVA's power plant] on the open market." [*Id.*, ¶ 32]. Section 3 sets out terms specific to TVA and its status as a "foundation shipper[.]" [*Id.*, ¶ 33]. Section 4(E) details TGP's responsibility and process for engaging stakeholders specific to its work for TVA, and Section 7(A)(i) includes the date by which TGP may terminate the Agreement under certain conditions [*Id.*, ¶¶ 34-35]. Section 9 of the Agreement explains the reimbursable costs, cost sharing, and reimbursement process [*Id.*, ¶ 36]. Exhibit D, paragraphs 1 and 2, list the rates for natural gas charged to TVA by TGP [*Id.*, ¶ 37]. Additionally, the Cumberland Agreement includes an unredacted provision that states "[n]o presumption shall operate in favor of or against any Party as a result of any responsibility or role that any Party may have had in the drafting of this Agreement." [Doc. 1-7, § 12, ¶ (H)].

Troutman asserts that release of the redacted provisions in the Cumberland Agreement would undermine TGP's competitive position and allow customers and rivals to obtain advantages during negotiations for future transactions [Doc. 52-1, ¶¶ 31-38].

**B. The Ridgeline Agreement and ETNG's use of precedent agreements**

Similar to the Cumberland Agreement, the Ridgeline Agreement between TVA and ETNG set forth the process by which ETNG would supply natural gas to a new power plant that potentially would replace another coal-fired power plant TVA currently operated [Doc. 56, pg. 5,

5

¶ 4]. Anne N. Moore, Director of Marketing and Business Development for the southeast at Enbridge, Inc., which is ETNG's corporate parent, served as the primary point of contact for ETNG during its negotiations with TVA for the Ridgeline Agreement [Doc. 44-1, ¶¶ 1, 3].

Moore explains that "each pipeline has developed its own form of precedent agreement and variations in language to address the particular characteristics of the [customer] and the unique complexities of each project." [*Id.*, ¶ 5]. Moore states that ETNG's precedent agreements contain commercially sensitive information "more than just pricing and other monetary figures, as each provision contains commercially sensitive information related to [ETNG's] development of projects and competition for [customers'] business." [*Id.*, ¶ 6]. Moore likens ETNG's precedent agreements to its "playbook" for developing pipeline projects [*Id.*, ¶ 7]. ETNG keeps precedent agreements confidential because of the type of information they contain [*Id.*, ¶ 8].

As to the Ridgeline Agreement, Moore states that it includes "several unique terms" that ETNG developed specifically for TVA and that "it would be competitively harmful to [ETNG] if competitors and future customers [were] able to see th[o]se unique terms." [*Id.*, ¶ 9]. Moore contends that the full disclosure of the Ridgeline Agreement could undermine ETNG's competitive position for future projects [*Id.*, ¶¶ 10-11]. Additionally, Moore details the process by which ETNG submits its precedent agreements to the Federal Energy Regulatory Commission ("FERC") and how it keeps its agreements confidential throughout that process, going as far as requiring non-government participants in that process to sign a non-disclosure agreement [*Id.*, ¶¶ 12-15].

Further, Moore explains that ETNG and TVA chose to negotiate for ETNG to provide natural gas transportation to one of TVA's power plants [*Id.*, ¶ 16]. ETNG submitted an initial draft of the Ridgeline Agreement to TVA on January 21, 2021, and negotiations over the Agreement continued through July 2021 [*Id.*, ¶ 17]. Moore asserts that ETNG "was the primary

6

drafter of the [Ridgeline Agreement]." [*Id.*, ¶ 18].  She further contends that during her discussions with a representative from TVA, TVA agreed that the terms and conditions of the Agreement would remain confidential [*Id.*, ¶ 19].  Since executing the Agreement with TVA, ETNG has not shared details of the Agreement with anyone outside the Enbridge corporate family and its outside counsel [*Id.*, ¶ 20].  According to Moore, the Agreement was not widely shared even within ETNG [*Id.*, ¶ 21].

Moore next details the specific redacted sections of the Ridgeline Agreement.  Section 4 of the Ridgeline Agreement discusses ETNG's "obligations relating to certain approvals that TVA would obtain in order for TVA to construct, own, operate[,] and maintain the gas-fired capability at [one of TVA's power plants]."  [*Id.*, ¶ 23].  ETNG initially submitted the language that would form Section 4 and that language—unchanged by TVA—was included in the final version of the Ridgeline Agreement [*Id.*, ¶¶ 24-26].  According to Moore, "[a]ll of section 4 includes financial and commercial information that [ETNG] treats as confidential and commercially sensitive, as the release of such information would provide competitors and future customers with insight into [ETNG's] project development and risk allocation strategies, which would cause competitive harm to [ETNG]."  [*Id.*, ¶ 27].

Section 7, sub-section (B), of the Ridgeline Agreement sets out the preliminary activities that ETNG must perform [*Id.*, ¶ 28].  TVA initially proposed language for this provision in June 2021, and ETNG countered with different language in July 2021 [*Id.*, ¶ 29].  TVA did not propose changes to ETNG's offered language, and the final version of the Ridgeline Agreement contains the language that ETNG submitted in July 2021 [*Id.*, ¶¶ 30-31].  According to Moore, the language in this provision is unique to TVA and not offered to other customers [*Id.*, ¶ 32].  Moore contends

that disclosure of this provision would put ETNG at a competitive disadvantage in future negotiations with other customers [*Id.*, ¶ 33].

Section 10 of the Ridgeline Agreement details the reimbursement of costs that ETNG will incur in performing its obligations under the Agreement in certain instances where the Agreement may be terminated [*Id.*, ¶ 34]. ETNG initially proposed the language for this provision, and TVA submitted "a minor clarifying change" that ETNG accepted [*Id.*, ¶ 35]. Otherwise, the language in this provision in the executed Agreement is identical to the language ETNG drafted [*Id.*, ¶¶ 35-37]. Moore asserts that this provision includes financial and risk allocation information that would harm ETNG by providing competitors with commercially sensitive information [*Id.*, ¶ 38].

Section 11 of the Ridgeline Agreement discusses the situations under which the Agreement may be terminated by the parties [*Id.*, ¶ 40]. ETNG submitted the initial language of this provision to TVA, and TVA made "one minor clarifying change[.]" [*Id.*, ¶¶ 41-42]. The provision in the executed Agreement includes language identical to that submitted by ETNG initially, save for TVA's one change [*Id.*, ¶ 43]. According to Moore, Section 11 reflects "specific financial and timing constraints in the development of the project," which ETNG treated as confidential because release of the information could cause it competitive harm [*Id.*, ¶ 44].

Lastly, the Ridgeline Agreement includes an unredacted provision that states "[e]ach and every provision of this [Agreement] shall be considered as prepared through the joint efforts of the Parties and shall not be construed against either Party as a result of the preparation or drafting thereof. It is agreed that no consideration shall be given or presumption made on the basis of who drafted this [Agreement] or any specific provision hereof." [Doc. 1-8, § 17, ¶ (C)].

### C. Procedural History

In March 2022, SELC filed its Complaint in this matter, alleging that TVA violated FOIA by failing to fully disclose the Agreements with ETNG and TGP [Doc. 1, ¶¶ 35-53]. SELC asked that the Court enter a judgment declaring that TVA violated FOIA by improperly withholding portions of public records, directing TVA to provide unredacted copies of the Agreements, and awarding SELC reasonable attorneys' fees and costs [*Id.*, pgs. 12-13]. In support of its Complaint, SELC attached the redacted versions of the Cumberland and Ridgeline Agreements that TVA turned over in response to SELC's FOIA request [Docs. 1-7, 1-8].

The parties subsequently entered into a partial settlement, and TVA disclosed some portions of both Agreements to SELC [Doc. 61]. Thus, the only portions still in dispute between the parties as to the Agreements are those noted above [*Id.*, pgs. 1-2]. The parties now move for summary judgment [Docs. 25, 43, 46, 52].

## II. LEGAL STANDARD

Because most challenges to an agency's use of a FOIA exemption involve purely legal questions, district courts typically resolve these cases on summary judgment. *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 544 (6th Cir. 2001). A district court reviews the government's assertion of exemptions and decision to withhold documents *de novo*. 5 U.S.C. § 552(a)(4)(B). "To prevail on summary judgment, the agency must show that it made a 'good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information' and that any withholding of materials was authorized within a statutory exemption". *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012) (quoting *CareToLive v. Food and Drug Admin.*, 631 F.3d 336, 340 (6th Cir. 2011)).

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest on the allegations in the pleadings and must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

Additionally, the resolution of an exemption's applicability at the summary-judgment phase in FOIA litigation "creates a situation in which a plaintiff must argue that the agency's withholdings exceed the scope of the statute, although only the agency is in a position to know whether it has complied with the FOIA [request.]" *Rugiero*, 257 F.3d at 544. "Ordinarily, an agency will offer detailed affidavits, rather than the requested documents themselves, to justify its decision to withhold information, and these affidavits are entitled to a presumption of good faith absent evidence to the contrary." *Rimmer*, 700 F.3d at 255 (citing *Jones v. FBI*, 41 F.3d 238, 242–43 (6th Cir. 1994)). "If bad faith on the part of the agency is shown, however, a district court may conduct an in camera review of any documents withheld or redacted." *Id.*; 5 U.S.C. § 552(a)(4)(B).

10

## III.    ANALYSIS[2]

As an initial matter, the Court addresses only TVA's claim that the withheld portions of the Agreements are covered by Exemption 4. SELC does not dispute that TVA conducted a good-faith search for records pertaining to its request or that the declarations in support of withholding portions of the Agreements were made in good faith. *See Rimmer*, 700 F.3d at 255.

Congress enacted FOIA in 1966 to "implement a general philosophy of full agency disclosure" of government records. *U.S. Dep't of Justice v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 754 (1989) (internal quotations omitted). The statute requires administrative agencies to make records "promptly available" in response to requests that (1) "reasonably describe[ ] such records" and (2) are "in accordance with published rules stating the time, place, fees (if any), and procedures to be followed" for releasing such records. 5 U.S.C. § 552(a)(3)(A). But an agency may withhold or redact information that falls within one of nine statutory exemptions. *Id.* § 552(b); *see also Rimmer*, 700 F.3d at 255. Even when an exemption applies, it is to be "narrowly construed[.]" *Rimmer*, 700 F.3d at 255 (citing *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). In 2016, Congress enacted the FOIA Improvement Act ("FIA") out of concern that "some agencies [were] overusing FOIA exemptions." *Seife v. United States Food and Drug Admin.*, 43 F.4th 231, 235 (2d Cir. 2022) (internal quotations omitted). "The FIA thus further limited agency withholding of requested documents." *Id.* "This reform codified executive branch policies adopting a presumption in favor of disclosure [under FOIA]." *Id.* (internal quotations omitted).

---

[2]    The Court notes that SELC, TVA, and TGP have requested oral argument on their motions. [Docs. 49, pg. 1; 52, pg. 2; 55, pg. 22]. But the parties are victims of their own success—each party provided such exemplary briefing that the Court finds oral argument unnecessary.

11

The parties set forth arguments both as to the applicability of Exemption 4 and whether TVA made the required showing under the FIA to withhold portions of the Agreements. The Court addresses each set of arguments in turn.

### A. Whether Exemption 4 applies to the withheld portions of the Agreements

Exemption 4, the sole exemption at issue here, allows federal agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). When an agency withholds non-trade-secret information under Exemption 4, it must demonstrate that the withheld information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *See Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983); *see also Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 729 (4th Cir. 2013); *Watkins v. U.S. Bureau of Customs and Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011).[3]

SELC argues that the Agreements are not exempt from disclosure under Exemption 4 [Doc. 26, pg. 10]. TVA responds that it found a good-faith basis for withholding portions of the Agreements from SELC because those withheld portions contained confidential commercial or financial information covered by Exemption 4 [Doc. 49, pgs. 1-12]. ETNG responds that under the correct legal standards, TVA properly withheld information in the Ridgeline Agreement [Doc. 44, pg. 21]. TGP, for its part, also asserts that TVA properly withheld portions of the Cumberland Agreement under Exemption 4 [Doc. 54, pg. 10]. It notes that Exemption 4 applies to the information contained in the withheld portions of the Cumberland Agreement rather than just the withheld portions themselves [Doc. 50, pg. 3].

---

[3]     The Court has not found, and the parties do not cite to, any binding caselaw from the Sixth Circuit addressing the precise contours of Exemption 4.

### 1. The withheld portions of the Agreements contain commercial or financial information.

"Withheld information must be commercial in and of itself to qualify for withholding under Exemption 4; that disclosure might cause commercial repercussions does not suffice to show that information is 'commercial' under Exemption 4." *Citizens for Resp. and Ethics in Washington v. United States Dep't of Justice*, 58 F.4th 1255, 1268 (D.C. Cir. 2023). TVA asserts that the withheld portions of the Agreements included business decisions, practices, financial commitments, and project and construction timelines [Doc. 49, pg. 12]. TVA further contends that other companies would be deterred from doing business with it, if it were forced to disclose the withheld portions of the Agreements [*Id.*, pg. 14].

ETNG asserts that the withheld portions of the Ridgeline Agreement constituted commercial or financial information because those portions related to its "'playbook' for developing natural gas pipeline projects . . . with the terms ensuring that the project is successful." [Doc. 44, pgs. 21-22]. It contends that the withheld portions relate to its business decisions, practices, and conduct, thus qualifying as commercial or financial information under Exemption 4 [*Id.*, pg. 22]. TGP contends that the redacted portions of the Cumberland Agreement contain rates and terms for service, procedures and mechanisms for providing an open season for a portion of the project with TVA, shipping terms applicable to TVA, and the process for engaging stakeholders [Doc. 54, pgs. 10-13].

Information protected by Exemption 4 must be commercial in its own right. *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). "[T]he commercial consequences of disclosure are not on their own sufficient to bring confidential information within the protection of Exemption 4 as 'commercial.'" *Citizens for Resp. and Ethics in Washington*, 58 F.4th at 1267. FOIA does not define the word "commercial," requiring the Court to give that term its ordinary

13

meaning. *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). "[I]nformation is commercial if it pertains to the exchange of goods or services or the making of a profit." *Citizens for Resp. and Ethics in Washington*, 58 F.4th at 1263 (citing relevant dictionaries from the time of enactment of FOIA).

"Given the ordinary meaning of 'commercial,' Exemption 4 [] applies to records that a business owner customarily keeps private because they 'actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or [that] relate to the income-producing aspects of a business.'" *Id.* (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290). "The exemption 'applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency.'" *Id.* (quoting *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006)).

Although the exemption is "not confined to information 'relate[d] to the income-producing aspects of a business,' its reach is finite." *Id.* (quoting *Baker & Hostetler LLP*, 473 F.3d at 319 (internal quotations omitted)). As long recognized, "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Id.* (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290). "Exemption 4 does not cover all information the public disclosure of which could inflict commercial harm." *Id.* at 1264. "Unlike other FOIA exemptions enacted at the same time, Exemption 4 does not make potential consequences of disclosure an explicit ground for withholding." *Id.* Exemption 4 also does not protect directly "against asserted harm to the government as a result of public scrutiny following disclosure." *Id.* Indeed, the text of Exemption 4 does not refer to the government's interests. *Id.*; 5 U.S.C. § 552(b)(4).

Although SELC does not dispute that the information contained in the withheld provisions is commercial or financial information, the Court still must review carefully the portions of the record submitted by the moving parties to determine whether a genuine dispute of material fact exists. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014). Here, the information contained in the withheld provisions of the Agreements constitutes commercial or financial information. ETNG and TGP submitted declarations that describe the information contained in the withheld provisions as relating to rates, terms, pricing, and business strategy [Docs. 44-1, ¶¶ 7-9; 52-1, ¶ 10]. ETNG characterized its Agreement as its "playbook" for developing new projects [Doc. 44-1, ¶ 7]. ETNG and TGP demonstrated that they have a "commercial interest" in the information submitted to TVA, and such information readily reveals "basic commercial operations" for both companies. *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *Baker & Hostetler*, 473 F.3d at 319. The information in the withheld portions of the Agreements is commercial or financial information within the meaning of Exemption 4.

### 2. TVA obtained the information in the withheld portions of the Agreements from a person within the meaning of Exemption 4.

Exemption 4 requires that confidential commercial or financial information be "obtained from a person" to qualify for its protection from disclosure. 5 U.S.C. § 552(b)(4). Under FOIA, a "'person' includes an individual, partnership, corporation, association, or public or private organization" but does not include a government agency. *Id.* § 551(2). Exemption 4, therefore, protects information and data only if it was not "generated within the Government." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 148 (2d Cir. 2010) (citing *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006) ("Unlike many other types of information subject to an agency's control, materials implicating Exemption 4 are generally not developed within the agency.")). SELC contends that the Agreements are not "information obtained from a

15

person" within the meaning of Exemption 4 [Doc. 26, pg. 10]. TVA, ETNG, and TGP respond that the information in the withheld portions of the Agreements was "obtained from a person." [Docs. 44, pg. 23; 49, pg. 14; 50, pgs. 3-5; 54, pgs. 13-15].

The Court's "key inquiry [here] is who 'the source of the information [was] in the first instance,' and not necessarily who created the particular document." *Elec. Priv. Info Ctr. v. Dep't of Homeland Sec.*, 928 F.Supp.2d 139, 147 (D.D.C. 2013) (quoting *In Def. of Animals v. NIH*, 543 F.Supp.2d 83, 103 (D.D.C. 2008)). Redacted information that constitutes an agency's own analysis does not fall within Exemption 4's coverage, even when the agency used information obtained from a person outside the agency to guide its analysis. *See S. All. For Clean Energy v. U.S. Dep't of Energy*, 853 F.Supp.2d 60, 67 (D.D.C. 2012). The Court must distinguish "between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency." *Id.* The former type of information receives protection from disclosure under Exemption 4, while the latter is unprotected. *See id.* As one district court judge recently framed it, "has the agency taken ingredients from the outside to create a new metaphorical dish, or instead offered tasting notes on another's pre-prepared meal?" *Occupational Safety & Health Law Project, PLLC v. U.S. Dep't of Labor*, No. 1:21-CV-2028-RCL, 2022 WL 3444935, at *5 (D.D.C. Aug. 17, 2022).

SELC explains that information the government itself creates is not "obtained" from another person and falls outside the scope of Exemption 4 [Doc. 26, pg. 10]. It asserts that TVA co-created the Agreements in collaboration with ETNG and TGP [*Id.*, pgs. 10-11]. SELC characterizes the Agreements as "legal instruments that were negotiated at arms-length" and, thus, not covered by Exemption 4 [*Id.*, pg. 11]. It argues that Exemption 4 does not allow a federal

16

agency to withhold "every detail of business deals that [the agency] makes with private parties." [*Id.*, pgs. 11-12].

TVA responds that information obtained from outside the agency and then modified through negotiations still is covered by Exemption 4 [Doc. 49, pg. 15]. It states that although the Agreements are the product of bilateral negotiations with ETNG and TGP, it did not alter substantially those companies' submissions to it during the drafting process for the Agreements, showing that Exemption 4 still applies to the withheld portions [Doc. 49, pgs. 15-16]. ETNG explains that it provided the language for the withheld portions of the Ridgeline Agreement and that TVA accepted that language either with minor change or no change at all [Doc. 44, pg. 23].

SELC replies that ETNG's and TGP's declarations in support of their motions for summary judgment show that the information in the withheld portions of the Agreements was not "obtained from a person" within the meaning of Exemption 4 [Doc. 55, pg. 7]. SELC contends that TVA was not a passive recipient of information from ETNG and TGP [*Id.*, pgs. 7-9].[4] TVA, ETNG, and TGP reply, reiterating their arguments from their cross-motions for summary judgment [Docs. 58, pgs. 5-7; 59, pgs. 3-8; 60, pgs. 6-16].

Beginning, as the Court must, with the statute's text, Exemption 4 uses the term "information" as opposed to document, memorandum, paper, file, record, contract, or provision. 5 U.S.C. § 552(b)(4); *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 548 (6th Cir. 2010) (reasoning that courts begin with "a natural reading of the full text.") (quoting *Elgharib v. Napolitano*, 600 F.3d 597, 601 (6th Cir. 2010)). FOIA does not define "information," and the Court gives that term

---

[4]     SELC also argues that TVA wishes to keep secret the withheld portion of the Agreements because it purportedly violated the National Environmental Policy Act ("NEPA") in executing the Agreements [Doc. 55, pgs. 16-17]. That argument is not properly before the Court and does not bear on whether Exemption 4 applies to SELC's FOIA request.

its "ordinary, contemporary, common meaning" when Congress enacted FOIA in 1966. *Food Marketing Institute*, 139 S. Ct. at 2362 (quoting *Perrin*, 444 U.S. at 42). At that time, broadly available dictionaries defined "information" as "the communication or reception of knowledge or intelligence," "knowledge obtained from investigation, study, or instruction," and "intelligence, news, facts, [or] data[.]" Webster's Seventh New Collegiate Dictionary 433 (1967); *see also* Webster's Third New International Dictionary 1600 (1966) (defining "information," in relevant part, as "intelligence, news, advices . . . facts or figures . . . data").

The use of "information" by Congress shows a deliberate choice to protect from disclosure the broader category of underlying facts, figures, and data used in the creation of documents by parties subject to FOIA. *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (reasoning that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Indeed, Congress demonstrated its ability to protect from disclosure whole documents by exempting "inter-agency or intra-agency memorandums or letters," "personnel and medical files and similar files," and "records" from FOIA's requirements. 5 U.S.C. § 552(b)(5)–(7). The term "information" indicates that the Court must look beyond the creation of the Agreements at issue and to whether "release of this information would disclose data supplied to the government from a person outside the government." *Gulf & W. Indus., Inc. v. U.S.*, 615 F.2d 527, 530 (D.C. Cir. 1979). In this context, SELC's focus on the creation of the Agreements is inapposite. The Court must look beyond the mere fact that TVA executed the Agreements with ETNG and TGP to the nature of the information underlying the withheld portions.

Here, SELC has not established that TVA "substantially reformulated" the information provided by ETNG and TGP to fall outside of Exemption 4's coverage. *S. All. For Clean Energy*, 853 F.Supp.2d at 67. Moore's declaration shows that ETNG initially submitted the language that

18

formed the withheld provisions of the Ridgeline Agreement and that TVA made no significant alterations to that language [Doc. 44-1, ¶¶ 24-26, 30-31, 35-37, 43]. The withheld portions of the Ridgeline Agreement constitute information only "slightly modified" by TVA and, thus, covered under Exemption 4. *Id.* Similarly, TGP "customized and tailored" the Cumberland Agreement to suit TVA's needs using TGP's rates, terms, and conditions related to its experience in the natural gas transportation industry [Doc. 52-1, ¶¶ 7-10]. That customization shows TGP produced the information to TVA that formed the withheld portions of the Cumberland Agreement. SELC cannot show that TVA reformulated TGP's information such that the provisions of the Cumberland Agreement represent TVA's own analysis. *See id.* Troutman's declaration also notes that the information TGP provided in the withheld portions of the Cumberland Agreement relates to activities it must perform under the Agreement, rates that it will charge TVA, the specific process for an open season TGP will conduct to complete part of the pipeline, and the timeframe for the Agreement. [*Id.*, ¶¶ 31-37].

Because the record does not show that TVA substantially reformulated the information provided by ETNG and TGP in the withheld portions of the Agreements, TVA obtained that information from ETNG and TGP within the meaning of Exemption 4.

### 3. The withheld portions of the Agreements contain confidential commercial or financial information.

The Court begins with the meaning of the word "confidential," which the Supreme Court recently clarified in *Food Marketing Institute v. Argus Leader*, to address the final element for the application of Exemption 4. *Food Marketing Institute* considered two conditions that might be required for information provided to the government to be confidential within the meaning of Exemption 4: (1) that information is "customarily kept private, or at least closely held, by the person imparting it," and (2) that "the party receiving [the information] provides some assurance

that it will remain secret." 139 S. Ct. at 2363. The Supreme Court held that at least the first condition must be met, reasoning that "it is hard to see how information could be deemed confidential if its owner shares it freely." *Id.*; *see also Varnum LLP v. U.S. Dep't of Labor*, No. 1:18-CV-1156, 2021 WL 138773, at *4 (W.D. Mich. Mar. 15, 2021).

In *Food Marketing Institute*, the government met that condition with uncontested testimony that the businesses providing the information to the government "customarily do not disclose [it] or make it publicly available 'in any way.'" *Id.* As to the second possible condition, the Supreme Court declined to consider whether privately held information might "lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private," because such assurances had been provided. *Id.* (emphasis omitted). Ordinarily then, to justify Exemption 4 withholding, the government must at least demonstrate that the withheld information itself is "customarily and actually treated as private by its owner." *Id.* at 2366. Here, that would mean showing that ETNG and TGP customarily and actually maintain in secrecy the information contained in their precedent agreements.

TVA explains that the information in the withheld provisions is covered by Exemption 4 because it is customarily kept private by ETNG and TGP, and TVA provided assurances that it would remain secret [Doc. 49, pg. 13]. ETNG also contends that it customarily kept information in the withheld portions of the Ridgeline Agreement confidential and that TVA assured it such information would remain private [Doc. 44, pg. 25]. ETNG further asserts that it does not widely share executed agreements internally and that it typically uses a confidentiality agreement in conjunction with its precedent agreements [*Id.*, pgs. 25-28]. TGP joins with TVA and ETNG and argues that the information it provided to TVA was confidential because it does not release that information to the public, treats the information as confidential, requires potential project partners

20

to treat its information as confidential, and requires assurances from those partners that they keep TGP's information confidential [Doc. 54, pgs. 15-17].

As with the first element under Exemption 4, SELC does not dispute that the information in the withheld provisions qualifies as "confidential."[5] Even if it did, the record shows that ETNG and TGP "customarily and actually treated as private" the information in the withheld portions of the Agreements. *Id.* at 2363. Both Moore and Troutman state as much in their declarations [Docs. 44-1, ¶¶ 8, 12-15, 19-21; 52-1, ¶¶ 12-15]. Moreover, ETNG and TGP do not disclose the information in the withheld portions broadly, and both companies maintain that confidentiality when submitting their precedent agreements to FERC [*Id.*]. TVA also assured both ETNG and TGP that it would treat the information in the withheld portions as confidential [Docs. 44-1, ¶ 19; 49, pg. 13; 52-1, ¶¶ 13, 15]. Thus, the information in the withheld portions of the Agreements constitutes confidential commercial or financial information.

*     *     *

Because the record shows that the withheld portions of the Agreements contain commercial or financial confidential information that TVA obtained from ETNG and TGP, Exemption 4 applies to protect those portions from disclosure under FOIA. 5 U.S.C. § 552(b)(4).

**B. Whether TVA satisfied its burden under the FIA**

In relevant part, the FIA amended FOIA to provide that, for FOIA requests submitted after June 30, 2016, an agency could withhold information only if it showed that the information *both* fell within an exemption of FOIA and at least one of two additional requirements was met. 5

---

[5] SELC does note that the Agreements do not contain provisions detailing expectations of confidentiality between TVA, ETNG, and TGP [Doc. 56, pgs. 8-9, ¶ 33; 12-13, ¶¶ 11-12]. But that does not undercut Moore's and Troutman's declarations discussing their usual course of practice for keeping precedent agreements confidential.

U.S.C. § 552(a)(8)(A)(i)(I)-(II). The requirements are that: (1) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (2) disclosure is prohibited by law. *Id.* If the agency cannot show one of the above requirements, it must disclose the information, even if the information falls within one of the FOIA exemptions. *See id.* "Applicability of a FOIA exemption is still necessary—but no longer sufficient—for an agency to withhold the requested information." *Seife*, 43 F.4th at 235. "In essence, the FIA imposes an additional, independent burden on the agency." *Id.*

SELC argues that TVA cannot establish that disclosure would harm an interested protected by the FIA [Doc. 26, pg. 15]. SELC contends that TVA's assertions about the competitive harm that ETNG and TGP would suffer are not the "specific and thoughtful agency review of foreseeable harm that Congress intended." [*Id.*, pg. 16]. Lastly, SELC states that if TVA is allowed to redact the disputed portions of the Agreements, it should be allowed only to redact "pricing information, engineering specifications, construction timelines, product formulas, credit worthiness representations, and insurance amounts." [*Id.*, pg. 17]. TVA responds that disclosure of the withheld portions of the Agreements would cause foreseeable harm because disclosure would destroy the confidentiality of the information and weaken ETNG's and TGP's negotiating positions in the future [Doc. 49, pgs. 17-20].

ETNG argues that disclosure of the withheld portions of the Ridgeline Agreement would violate the Trade Secrets Act, satisfying the "prohibited by law" prong of the FIA's mandate [Doc. 44, pg. 28]. ETNG also argues that even if the Trade Secrets Act did not prohibit disclosure, disclosure of the withheld portions would destroy the interest in confidentiality protected by Exemption 4 and lead to competitive harm for ETNG [*Id.*, pgs. 28-29]. ETNG asserts that the withheld portions would reveal how it protects itself from risk, how it structures projects, and how

it manages to build projects successfully [*Id.*, pg. 29].  According to ETNG, disclosure of such information would lead to competitors offering "similar or better terms for a project, thus harming [ETNG's] competitive market position."  [*Id.*].  TGP similarly contends that the release of the withheld portions of the Cumberland Agreement would cause substantial harm to its competitive position in the natural gas transportation market [Docs. 50, pg. 6; 54, pg. 17].

SELC responds that the Trade Secrets Act does not provide an independent basis to withhold the Agreements because it is coextensive with Exemption 4 [Doc. 55, pgs. 17-18].  Similarly, SELC contends that TVA, ETNG, and TGP offer only vague and conclusory assertions of competitive harm, which cannot justify withholding portions of the Agreements under the FIA [*Id.*, pgs. 22].  TVA replies that ETNG and TGP are in the best position to articulate whether they face foreseeable harm from the disclosure of the Agreements [Doc. 58, pgs. 9-11].  TVA asserts that they have presented sufficient detail to show why disclosure of the Agreements would cause them foreseeable harm [*Id.*, pgs. 9-11].  ETNG and TGP reply, reiterating their arguments from their cross-motions for summary judgment [Docs. 59, pgs. 8-10; 60, pgs. 16-19].

Congress added the foreseeable harm requirement to the FIA "to foreclose the withholding of material unless the agency can articulate both the nature of the harm from release and the link between the specified harm and specific information contained in the material withheld."  *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021).  Exemption 4 protects "the commercial or financial interests of the submitted information that is of a type held in confidence and not disclosed to any member of the public by the person to whom it belongs."  *Seif*, 43 F.4th at 240.  Thus, the FIA's foreseeable harm standard requires TVA to show a foreseeable harm to the commercial or financial interests of ETNG and TGP covered by

Exemption 4. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369.

Agencies cannot rely on "mere speculative or abstract fears, or fear of embarrassment to withhold information." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369. Additionally, an agency cannot meet its burden of showing foreseeable harm by resting on "generalized assertions." *Id.* (quoting *Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)). The agency must provide a focused and concrete demonstration of why disclosure of the particular type of material will, in the specific context of the agency action at issue, "actually impede those same agency [actions] going forward." *Id.* (internal citations omitted).

Here, TVA's arguments that disclosure of the withheld portions of the Agreements would destroy the confidentiality of those provisions is inapposite. TVA must show that disclosure of the withheld portions would cause foreseeable harm to ETNG's and TGP's commercial or financial interests—not the confidential nature of the information withheld. Further, the Court, guided by the text of the FIA, considers only whether disclosure would cause foreseeable harm to those interests and not the gravity of harm potentially caused by disclosure. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I).

In this context, TVA, ETNG, and TGP have shown that disclosure of the withheld portions of the Agreements would harm their commercial or financial interests. Moore's and Troutman's declarations set out the potential harm that they face from competitors who view the contents of the withheld portions of the Agreements [*See* Docs. 44-1, 52-1]. Specifically, Moore states that disclosure of the withheld portions of the Ridgeline Agreement would create unreasonable expectations from future customers, hamper ETNG's ability to propose terms, and divulge ETNG's project development and risk allocation strategies [Doc. 44-1, ¶¶ 11, 27]. Similarly,

Troutman explains that TGP's competitors would be able to underbid it on future natural gas projects or gain an advantage in future negotiations with TGP with the information contained in the withheld portions of the Cumberland Agreement [Doc. 52-1, ¶¶ 26-27, 31, 33, 38]. Moore and Troutman provide a focused demonstration of why disclosure of the withheld portions of the Agreements will harm ETNG's and TGP's commercial or financial interests in the government-contracting context and impede TVA's ability to enter into future precedent agreements with natural gas transporters. *See id.*

Accordingly, TVA has met its burden under the FIA to withhold portions of the Agreements because disclosure of those provisions would harm the interests protected by Exemption 4. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I). Because the Court finds that TVA has shown foreseeable harm to the interests protected by Exemption 4, the Court need not address ETNG's remaining argument about whether disclosure is prohibited under the Trade Secrets Act.

## IV. CONCLUSION

For the reasons stated, TVA's, ETNG's, and TGP's motions for summary judgment [Docs. 43, 46, 52] are **GRANTED**, and SELC's motion for summary judgment [Doc. 25] is **DENIED**. A separate judgment shall issue.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

25